MR. JUSTICE SHEEHY
dissenting:
The majority does not meet head on the basic fact situation, established by the claimant on which the Workers’ Compensation Court found in favor of the claimant.
The facts as found by the Workers’ Compensation Court include these:
“That the testimony reveals that the decedent reported for work about 8:00 a.m. Saturday, November 1, and was assigned the task of steam cleaning engines and transmissions of certain heavy equipment operated by the employer. His regular duties for which he was employed were those of an oiler. The decedent was described as a good oiler and worker. That the job of steam cleaning was different from the job as an oiler.
“That the task of steam cleaning was described as an unpleasant, *85 dirty job which required one to drag around the steam hoses from one part of a machine to another. The steam cleaner wore rain gear and goggles for protection from getting wet and dirty. That the job was described as not being more difficult than the job of an oiler.
“That Delmar Bradway, Maintenance Superintendent, testified that the decedent worked at steam cleaning until about noon on November 1 then had lunch. He stated also that two mechanics who also were working overtime on November 1 were excused at noon because they wanted to go home. Apparently in the afternoon the only employees left at the site were Bradway and the decedent.
“Bradway further testified that in the afternoon he and the decedent operated the steam cleaner to get steam off the batteries on the equipment. He said that he operated the steam cleaner while the deceased drove an old Ford F600 truck on which the steam cleaner was mounted. They finished the job and the decedent was assigned to the task to drain the steam cleaner and hang up the hoses. The work day, according to the record, terminated about 3:30 p.m.
“That Bradway testified that the decedent signed himself off the job at 3:30 p.m. and drove away in his pickup truck and did not report any injury or ill effects from working on the job. He later saw the decedent standing by his pickup with the hood raised and again the decedent did not indicate that there were any ill effects from the job.
“That James McCarthy, an employer of Peter Kiewit and Sons who also owns the grocery store and post office in Decker, Montana saw the decedent sometime between.3:50 p.m. and 4:50 p.m. on November 1, 1975 in the yard at his store. The decedent and McCarthy visited as they did on many occasions in the past. According to McCarthy the decedent did not indicate that he wanted to see a doctor nor that he was feeling bad. McCarthy then excused himself and went to work on a pump in the cellar of his building. A short time later the decedent came to the door, knocked, and McCarthy came up from the cellar. The decedent asked McCarthy, a long time friend, to take him to town, which he had never done before; and McCarthy said that he would be with him in ten *86 minutes, as soon as he was through with the task of fixing the pump in his basement. Twenty minutes later McCarthy saw the decedent. He looked pale and wasn’t his usual self.
“That the decedent apparently drove himself to Memorial Hospital of Sheridan County, Wyoming a distance of approximately 35 miles, where he was admitted at approximately 6:00 p.m. on November 1, 1975. Upon admission the decedent gave a history to the attending physician, Dr. William Williams, of having an abrupt onset of left anterior chest pain with pain radiating into the left arm at approximately 2:00 p.m. November 1, 1975. The deceased further indicated that the pain went to its peak intensity within 10 to 15 minutes and then continued until he presented himself at the hospital. An electrocardiogram was performed and findings were consistent with an acute anterior myocardial infarction.
“That the decedent was put on a monitor and treated with medication until approxmately 2:57 a.m. November 2, 1975 when his heart changed rhythm and, after several electric shock treatments and medication, the decedent died.
“Dr. Donald G. Fletcher, a physician and surgeon who practices in Conrad, Montana, testified on behalf of the claimant during which testimony the following facts were established:
“a. An anterior myocardial infarction is the most severe type of myocardial infarction because the left anterior coronary arteries supply blood to roughly half the heart.
“b. That the decedent suffered the actual attack at the time the pain reached its peak intensity which is approximately 2:00 p.m. according to the history given to Dr. Williams on November 1, 1975. The hospital records regarding this history have been stipulated into evidence.
“c. After suffering a myocardial infarction at approximately 2:00 p.m. November 1, 1975, the decedent’s continued employment activities, which, according to Delmar Bradway, consisted of driving a 1963 or 1964 F600 Ford truck, without power steering, and with a four-speed manual transmission with clutch, from one *87 scraper to another for approximately one and one half hours, and thereafter driving himself in an automobile to a hospital, a distance of approximately 35 miles, aggravated the existing, underlying myocardial infarction. The said aggravation consisted of exertion caused by the above activities which placed an unusual demand on the decedent;s heart thereby causing further muscle damage to the heart, making the heart more susceptible to arrhythmia or anoxic fibrillation. The employment activities of the decedent after 2:00 p.m. November 1, 1975, and exertion caused by those activities reduced the decedent’s chances of living.
“d. That prompt first aid and medical attention as soon after the onset of attack as possible is the most important time for treatment of this kind of injury. Such treatment consists of immediate hospitalization, the administration of oxygen, medication, monitoring, and placing the patient in complete physical and emotional rest.
“That based on the testimony of Drs. Fletcher and Williams the activities engaged in by the decedent after the onset of the symptoms of a myocardial infarction probably were a contributing factor in causing the onset of the arrhythmia that led to his death.
“That although the strain of the activities engaged in by the claimant at the time of the onset of symptoms of the myocardial infarction may not have been unusual, the activities and the results of such activities and the resulting myocardial infarction were unusual.”
The foregoing findings of the Workers’ Compensation Court demonstrate that the claimant, Violette Moen came to this Court backed by the Workers’ Compensation Court in her claim that the continued work exertions required of her husband after the onset of his infarction, the strain to which he was put thereafter, and the driving of the automobile necessary to seek medical attention, were tangible happenings of a traumatic nature from an unexpected cause or unusual strain that resulted in internal physical harm. As a result therefrom he suffered death. Her case fits ab *88 solutely within the definitions of an injury as set out in section 39-71-119, MCA.
The majority opinion contains no effort to explain away or set aside the findings of the Workers’Compensation Court as we have set them forth above. In fact they could not be set aside, because findings of the Workers’ Compensation Court enjoy the protection of Rule 52, Mont.R.Civ.P., and must stand unless clearly erroneous. When substantial evidence supports the findings of Workers’ Compensation Court, the appellate court cannot overturn them. Dumont v. Wickens Const. Co. (1979), 183 Mont. 190, 598 P.2d 1099, 1106. We followed that rule recently in Stamatis v. Betchel Power Co. (1979), 184 Mont. 64, 601 P.2d 403.
I would affirm the Workers’ Compensation Court in this case.
MR. JUSTICE DALY concurs.